UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CR. NO. 05-276 (HHK) |
| | : | |
| v. | : | |
| | : | |
| ADRIANA SANTAMARIA | : | |
| | : | |
| Defendant. | : | |
| | : | |

## STATEMENT OF OFFENSE

Pursuant to Fed. R. Crim. P. 11, the defendants, Adriana Santamaria, also known as Adriana Cabrales, and Maria Cabrales, also known as Maria Caballeros, under penalty of perjury, agree and stipulate, to the following facts in connection with their pleas of guilty as follows.

### Background

Between on or about January 1989, and on or about March 2002, and at all times relevant to this offense, defendant Santamaria was employed as the Administrator of the Department of Microbiology and Immunology (hereinafter "Department") at the Georgetown University Medical Center (hereinafter "Georgetown"), located at 4000 Reservoir Road, NW, Washington, D.C. Principal Investigators ("Principals") in the Department oversaw research conducted in the fields of microbiology and immunology, and the Department received grant money in excess of $10,000 a year from the National Institutes of Health for research in the areas of allergy and infectious diseases; dental and craniofacial diseases; cancer; stroke; and other neurological disorders. As the Administrator of the Department, defendant Santamaria was responsible for hiring, training, and supervising support personnel. Defendant Santamaria also oversaw the Department's financial affairs, including budget preparation, spending, and control.

Defendant Maria Cabrales is the sister of defendant Santamaria.

### The Honoraria Scheme

Between on or about May 1998 and on or about October 2001, defendants Santamaria and Cabrales conspired to obtain money from the Department by fraud. The goal of the conspiracy was unjustly to enrich themselves by means of a scheme whereby defendant Santamaria would submit authorization for the payment of honoraria in the names of defendant Cabrales and her husband for scientific lectures they never gave nor had any capacity to give. The scheme functioned as follows.

Defendant Santamaria would make numerous fraudulent requests for the payment of honoraria in the names of defendant Cabrales and her husband. Defendant Santamaria had no authority to engage lecturers on behalf of the Principals, let alone the services of her relatives, who were in no way qualified to speak on any subjects related to the fields of microbiology and immunology. The standard procedure for the payment of honoraria required one of the Principals, not defendant Santamaria, to arrange for the lecture. The Principal would draft and sign a letter to the lecturer confirming the details of the lecture. Defendant Santamaria was not authorized to contact potential speakers, arrange a lecture, or sign the agreement letter confirming the details, and at no time did any of the Principals delegate this authority to the defendant. Defendant Santamaria would falsely generate invitation letters allegedly on behalf of various Principals in the names of defendant Cabrales and her husband confirming the details of the proposed lecture.

After the lecture purportedly occurred, an expense authorization for payment would be submitted. The authorization form required the social security number of the lecturer, the name of the Principal who arranged for the lecture, and finally, defendant Santamaria's approval as the Department's Administrator. Defendant Santamaria would submit fraudulent authorization forms, confirmation letters, and IRS W-9 tax forms to the Accounts Payable Department of Georgetown

2

University for the issuance of a check to defendant Cabrales and her husband. Upon payment, defendants Santamaria and Cabrales would deposit the Department checks in accounts in the names of defendant Cabrales and her husband. In turn defendant Cabrales would pay defendant Santamaria by check a share of the proceeds.

In sum, defendant Santamaria submitted 37 fraudulent expense authorization forms to the Georgetown Accounts Payable Department, resulting in a total of $290,000 in honoraria paid in the names of defendant Cabrales and her husband for lectures never in fact given. In return, during the same period of time, defendant Santamaria received $69,052.31 from the Allfirst joint accounts of defendant Cabrales and her husband.

## The Casual Labor Scheme

Between on or about November 1995 and on or about June 1998, defendant Santamaria submitted fraudulent requests to Georgetown for the payment of casual labor by various relatives, including defendant Cabrales. Georgetown hires individuals to work as casual laborers in circumstances where the work performed by the individual will be for a limited period of time. Defendant Santamaria had no authority to hire any individual, let alone her relatives, for temporary employment by the Department without the approval of a Principal. At no time did Principals approve or have knowledge of the hiring of the defendant's relatives. Furthermore, there is no basis to believe that any of these individuals, in fact, performed any service or work for the Department.

Casual labor workers are not subject to a formal hiring process. In order for an individual to receive payment for casual labor, a casual labor report must be completed and submitted to the payroll office. The casual labor report lists, among other things, the name, social security number, and address of the worker along with the number of hours worked and hourly rate. In addition, the report will designate the cost center code assigned for the work.

Defendant Santamaria completed casual labor report forms for her family members and submitted them to payroll. As a result, Georgetown issued checks to those family members, including defendant Cabrales. Defendant Santamaria assigned her family member's wages to cost centers associated with Principals in the Microbiology Department. Through this scheme, defendant Santamaria and defendant Cabrales defrauded the Department out of $87,750.

### The Personal Reimbursement Scheme

Between on or about April 1996 and on or about November 1998, defendant Santamaria submitted numerous fraudulent requests for the reimbursement of purported business expenses. Most often, the defendant would submit receipts from restaurants near her residence in Centreville, Virginia, claiming they were for business dinners with Principals or affiliated graduate students. The defendant had no authority or legitimate reason to take graduate students to dinner, and certainly did not receive such authority from any of the Principals listed on the reimbursement forms as having approved the expenses. The forms as such were fraudulently submitted and a review of the receipts revealed that the defendant received payments totaling $6,816.11 through this scheme.

### The Third-Party Vendor Scheme

Between on or about July 1996 and February 2002, defendant Santamaria submitted fraudulent purchase requisition requests and expense authorization forms to the Accounts Payable Department causing Georgetown to reimburse vendors for unauthorized personal items and services ordered by defendant Santamaria.

Georgetown University had a system that allowed a Department to purchase goods and services from vendors utilizing purchase orders. A purchase order is an agreement that Georgetown will pay a vendor to perform services or provide goods. For example, a purchase order would allow

a department to buy $10,000 worth of computer equipment each year from a certain computer company.

In order to generate a purchase order, a Department employee must fill out a purchase requisition. The requisition specifies the vendor, product or service, price, and the cost center associated with the purchase. The purchase requisition is then sent to the Purchasing Department at Georgetown which assigns a purchase order number to it and provides that number to the vendor. The vendor then provides the service or product to Georgetown and sends the invoice with the purchase order number to the Accounts Payable Department which then issues a check to the vendor.

Defendant Santamaria, in her capacity as the Department's Administrator, generated purchase requisitions for products and services for her personal use and assigned those purchases to cost centers associated with Principals. The Principals never requested or approved these purchases.

In one instance, the defendant generated a purchase order with Cellular One to obtain a mobile phone in her name. Cellular One sent the monthly bills to defendant Santamaria who then submitted the bills to the Accounts Payable Department, referencing a purchase order number. Defendant Santamaria used the cell phone for her personal use. The Principal who allegedly approved the purchase of the Cellular One phone never in fact authorized the defendant to acquire the phone service.

The defendant also used Expense Authorization forms to purchase discrete personal items. For example, she filled out expense authorization forms for payment to York Flowers, a retail vendor of floral arrangements and other gift items. The stated purpose of the purchase request was for a "fruit basket to the Delgado family as a thank you for expediting matters for the department

in an efficient manner." The purported originator of the request never requested such a purchase, never signed his name to the form, and had no knowledge whatsoever of a Delgado family in conjunction with the Department's affairs.

### The Credit Card Scheme

Finally, between on or about April 2001 and January 2002, defendant Santamaria used her personally issued Department credit card to make numerous personal purchases. In order to obtain the card, the defendant was required to attend a class on the proper procedures and policies for use of the card. In addition, she signed, on April 9, 2001, an agreement stating that she would comply with the requirements of proper use. The agreement reiterated and made clear that the card in no way was to be used for personal purchases, especially since the University paid the bill on her card automatically each month through electronic transfer.

As part of the card set up, purchases for each card holder were hard coded or assigned to a specific cost center associated with the Department and the specific employee. All purchases by defendant Santamaria on her Georgetown Credit card were supposed to appear on a monthly income and expense statement with a particular cost center. In this way, Georgetown could track usage of each card holder.

Georgetown also attempted to identify and properly account for the specific type of expense for each credit card purchase. Each employee purchase on the credit card was initially hard coded to a temporary holding account. The Administrator of the Department would then reassign the expense from the temporary holding account to a specific expense account code such as computer equipment or lab supplies. It was the defendant's duty, as the Microbiology Department's Administrator, to review the credit card purchases each month and assign the proper expense account code.

Defendant Santmaria's duties as outlined above enabled her to conceal the unauthorized use of her own Department issued credit card by reassigning her fraudulent charges from her personal cost center to a valid expense account code in another cost center.

For example, on July 2, 2001, defendant Santamaria charged $1,285.24 at the Guitar Center for the purchase of musical equipment for her son. Without any tampering on the defendant's part, the charge would have appeared in the monthly income statement of her Department as a credit card purchase from the cost center assigned to her, with the account code for the temporary holding account. However, through the Defendant's intervention, the purchase in fact was posted to another cost center.

By redistributing her unauthorized purchases to cost centers not associated with her and to legitimate expense codes, defendant Santamaria successfully concealed her fraudulent purchases for a sustained period of time. In total, the defendant charged $17,384.57 of purely personal expenses, such as lumber from a home supply store delivered to her home, on her Department issued credit card before the fraud was uncovered.

<u>**Indirect Costs Counted as Loss**</u>

Because the defendant embezzled allocated research grant money, the Department had to reimburse NIH for not only the direct amount of the embezzlement, but also for the indirect costs that are part of a research grant. Indirect costs, also termed "facilities and administrative costs," are costs such as electricity, water, and administrative support that are not directly tied to a single project.

Georgetown University negotiates indirect cost rates for federally funded and sponsored projects with the Division of Cost Allocation of the Department of Health and Human Services. The rates negotiated are in effect for the three-year cycle. The indirect cost rate for the affected grants

in this case ranged as high as 61%. Therefore, Georgetown reimbursed NIH additional funds to cover the indirect costs related to the federal grant funds taken by defendant Santamaria's fraudulent schemes.

Defendant Santamaria, in her capacity as the Department's Administrator, knew that federal grants included funds for indirect costs. Accordingly, the reasonably foreseeable consequence of her conduct was loss of both the directly embezzled funds as well as loss of the associated indirect costs.

### Amount Obtained from the Department

As a result of their actions, the defendants obtained more than $350,000 in federal and non-federal grant money from the Department. In addition, the Department reimbursed indirect costs of more than $150,000 to NIH for disallowed draw downs, for a total loss to the Department in excess of $500,000.

_____  
Adriana Santamaria

8/24/05  
Date